Argued and submitted September 9, 1994; resubmitted In Banc January 3, affirmed April 19, petition for review allowed June 20, 1995 (321 Or 284)

**ZIDELL MARINE CORPORATION,**
a corporation,
*Plaintiff,*

*v.*

**WEST PAINTING, INCORPORATED,**
a corporation,
Terry K. Gaya, Holly Gaya,
Capital Resource Finance Corp.,
a corporation, John Maring,
Rodda Paint Co., a corporation,
and Jotun Valspar Marine Coatings,
also known as Jotun Valspar,
a division of the Valspar Corporation,
a corporation,
*Respondents,*

*and*

**MILLER PAINT CO., INC.,**
a corporation,
*Appellant.*

(9307-04357; CA A81893)

894 P2d 481

In Banc*

Monica M. O'Brien argued the cause for appellant. With her on the opening brief was Gleason, Scarborough, McNeese, O'Brien & Barnes, P.C. With her on the reply brief were Curt B. Anderson and Gleason, Scarborough, McNeese, O'Brien & Barnes, P.C.

Gary Roberts argued the cause for respondents West Painting, Incorporated, Terry K. Gaya, Holly Gaya, Capital Resource Finance Corp., and John Maring. With him on the brief was Schwabe, Williamson & Wyatt.

No appearance for respondent Jotun Valspar Marine Coatings.

No appearance for respondent Rodda Paint Co.

De MUNIZ, J.

---

*Warren, J., not participating.

Landau, J., concurring.

Leeson, J., dissenting.

## De MUNIZ, J.

Plaintiff Zidell Marine Corporation (Zidell) brought this interpleader action under ORCP 31 to determine priority among competing claims to money Zidell owes under a contract with defendant West Painting, Inc. (West). On cross-motions for summary judgment, the trial court entered an ORCP 67 B judgment finding that defendant Capital Resource Finance Corp. (Capital) had a perfected security interest in the funds and that that interest was superior to the claims of all the other defendants. Defendant Miller Paint Co., Inc., (Miller) appeals. We affirm.

Defendants Terry and Holly Gaya (Gaya) are the owners of West. West was incorporated in Washington in March 1985, but was administratively dissolved on June 16, 1986. Gaya was not aware that West's corporate status had lapsed, and West continued to operate as a corporation, filing corporate tax returns, and paying creditors, including Miller, from a corporate account.

In December 1984, West applied for credit from Miller, which granted the application and opened an account in the name of West Painting, Inc. There was no individual guaranty of the credit obligation. Pursuant to the line of credit, Miller sold paint to West. In 1991, Gaya, as President of West, signed a "Security Agreement" with Capital in which West assigned and sold its accounts receivable to Capital as a factor in order to finance West. Capital filed a financing statement in Oregon in 1991 under the name West Painting, Inc. On April 6, 1992, West and Zidell entered into a contract for West to paint and do other work on a barge owned by Zidell.

In late 1991, Miller sued West for unpaid purchases of paint made between August 1990 and July 1991. On March 18, 1992, Miller obtained a judgment against West. In June 1992, Miller discovered that West had been dissolved. Miller then sued the Gayas individually and obtained a judgment against them in July 1992. On June 14, 1993, Miller served two continuing writs of garnishment on Zidell, one for the West judgment and one for the judgment against the Gayas. Zidell responded to the garnishment in the West case, stating that Zidell might owe West as much as $78,860 in the

future, subject to offsets, but that it would not release the funds until all offsets were determined and applied. In the Gayas' case, Zidell responded that it did not owe money to or hold personal property of either Terry Gaya or Holly Gaya.

In this interpleader action, Miller filed a cross-claim against all the other defendants, alleging that, by its writs of garnishment, it became a lien creditor whose claim was superior to those of the other defendants. Miller assigns error to the trial court's dismissal of that cross-claim, the denial of its motion for summary judgment, and the grant of summary judgment in favor of defendants West, the Gayas, Capital and John Maring (respondents).[1] In its combined arguments on those errors, Miller argues that its writ of continuing garnishment was proper and that, by virtue of that writ, Miller is a lien creditor with priority over unperfected security interests. ORS 79.3010.[2]

Respondents concede that *if* Miller's continuing writ of garnishment was effective to reach sums owed by Zidell, the writ would make Miller a lien creditor and that Miller would then have priority over an *unperfected* security interest. They argue, however, that Miller's use of a continuing writ of garnishment here was ineffective, because it sought to garnish an entity that was not the debtor's employer and it sought to garnish property that was not wages. Respondents also argue that Capital was the owner of the account receivable or had a perfected security interest in the funds, and, thus, that the trial court correctly held that Capital was entitled to receive the funds.

Whether Miller is a judgment lien creditor depends on whether the writ of continuing garnishment that Miller served on Zidell is effective. Either the clerk of the court or the attorney for the creditor can issue two types of garnishments. The standard writ garnishes personal property of the debtor or debts owed to the debtor by the garnishee on the

---

[1] Defendants Rodda Paint Co. and Jotun Valspar Marine Coatings did not appear in this appeal.

[2] ORS 79.3010(3) defines a lien creditor as

"a creditor who has acquired a lien on the property involved by attachment, levy, or the like and includes an assignee for benefit of creditors from the time of assignment, and a trustee in bankruptcy from the date of the filing of the petition or a receiver in equity from the time of appointment."

date of service of the writ or within 45 days. ORS 29.145 to ORS 29.375. The writ of continuing garnishment was created by statute in 1989. It applies expressly to "employers" of the debtor and garnishes the "wages" or "earnings" owed at the time of service of the writ or accrued within 90 days. ORS 29.401 to ORS 29.415.

■ Miller's argument that Zidell can be a garnishee under the continuing writ is based on language in the section of the statutory form entitled "EARNINGS EXEMPTION COMPUTATION SCHEDULE."[3] That schedule is used to determine the earnings subject to garnishment. The directions on the form state:

> "The Garnishee must complete the following form and fill in the correct amounts only if the Garnishee is an employer of the Debtor under ORS 23.175."

In turn, ORS 23.175(3) provides:

> " 'Employer' means an entity or individual who engages a person to perform work or services for which compensation is given in periodic payments or otherwise, even though the relationship of the person so engaged to the employer may be as an independent contractor for other purposes."

Relying on the definition in ORS 23.175(3), Miller contends that the statutory scheme shows that the legislature did not intend a distinction between an employee and independent contractor for use of a continuing garnishment. It argues that the legislature did not intend a garnishee to have to determine whether the debtor is an "employee" or an "independent contractor," but only "whether money is due to the judgment debtor for services performed to the garnishee." Thus, Miller argues, the continuing garnishment was proper here where West or the Gayas were independent contractors.

We conclude, however, that the continuing writ does not garnish all assets owed by a garnishee to a debtor. In so concluding, we part company at the outset with the dissent, which determines that the continuing writ "may be used to garnish more than just earnings owed by an employer to an

---

[3] Miller points to both ORS 29.411 (a writ issued by a clerk of the court) and to ORS 29.415 (a writ issued by an attorney). The language relied on is identical and, because the writ here was issued under ORS 29.415, we refer to that statute.

employee." 133 Or App at 744. The dissent arrives at that determination by relying on the following emphasized language in the first sentence of ORS 29.401, which sets out the parameters of a writ of continuing garnishment:[4]

"In addition to garnishment proceedings *otherwise available under* ORS 29.125 to 29.375 and *29.401 to 29.415*, a person for whom a writ of garnishment may be issued under ORS 29.137 may obtain a writ of continuing garnishment against any garnishee who is an employer of the defendant." (Emphasis supplied.)

ORS 29.401 is the codification of House Bill 2666, section 2 (1989). The reference to "ORS 29.401 to 29.415" was not part of House Bill 2666. As enacted, the first sentence of the bill reads:

"In addition to garnishment proceedings otherwise available under ORS 29.125 to 29.375, a person for whom a writ of garnishment may be issued under ORS 29.137 may obtain a writ of continuing garnishment against any garnishee who is an employer of the defendant." Or Laws 1989, ch 876, § 2.

Despite the fact that the reference to ORS 29.401 and ORS 29.415 was not in House Bill 2666, it was inserted into ORS 29.401 in the printed 1989 edition of the ORS.

In 1991, the legislature amended ORS 29.401 to increase the length of a continuing writ from 60 to 90 days. Or Laws 1991, ch 845, § 9. The increase in time was the only amendment to ORS 29.401 before the legislature, but the amendment was printed on a copy of ORS 29.401 that included the erroneous reference to "ORS 29.401 to 29.415." From that, the dissent appears to conclude that the 1991 amendment approved not only the increase in time, but also the error of Legislative Counsel.

---

[4] ORS 29.401 further provides, as relevant:

"In addition to garnishment proceedings otherwise available * * *, a person * * * may obtain a writ of continuing garnishment against any garnishee who is an employer of the defendant. To the extent that the *earnings* are not exempt from garnishment, the garnishment shall be a lien and continuing levy against *earnings* owed by the garnishee to the defendant at the time of service of the writ of continuing garnishment and on all *earnings* accruing from the garnishee to the defendant from the date of service until 90 days have expired since the date of issuance of the writ or until the employment relationship is terminated * * *." (Emphasis supplied.)

We do not agree. As demonstrated by the dissent's interpretation of the assets reached by a continuing writ, the reference to "ORS 29.401 to 29.415" could well effect a substantive change in the continuing writ provisions. Legislative Counsel does not have the authority to make a substantive change, ORS 173.160,[5] and the legislature's 1991 amendment to ORS 29.401 did not do so.

■ When clerical errors would defeat the purpose of an act, a court will correct them when the true meaning is obvious. *See State v. Lermeny*, 213 Or 574, 580, 326 P2d 768 (1958). In *Bush v. Greyhound Lines, Inc.*, 295 Or 619, 669 P2d 324 (1983), the Supreme Court addressed a clerical error arising from Legislative Counsel's renumbering of sections of the civil rights laws following the 1979 legislative session. The Supreme Court examined the legislative history of the amendments and concluded that nothing in the history showed that the legislature intended the result that occurred from Legislative Counsel's error.

In *Mitchell v. Board of Education*, 64 Or App 565, 568, 669 P2d 356, *rev den* 296 Or 120 (1983), Legislative Counsel had omitted a cross-reference to a particular statute. We held:

> "In preparing the statutes for publication, Legislative Counsel has the authority to make changes in section numbers, cross-references and other matters of form and clarity. However, changes must be limited so that they do 'not alter the sense, meaning, effect or substance of any Act.' ORS 173.160. The statutes certified by Legislative Counsel after revision are prima facie evidence of the law, ORS 171.285(2), but they are not conclusive evidence. When, as here, it appears that the law as the legislature adopted it differs in substance from the law as codified, we must follow the legislature's version."

___

[5] ORS 173.160 provides:

"In preparing editions of the statutes for publication and distribution, *the Legislative Counsel shall not alter the sense, meaning, effect or substance of any Act*, but, within such limitations, may renumber sections and parts of sections of the Acts, change the wording of head-notes, rearrange sections, change reference numbers to agree with renumbered chapters, sections or other parts, substitute the proper subsection, section or chapter or other division numbers, strike out figures or words which are merely repetitious, change capitalization for the purpose of uniformity, and correct manifest clerical or typographical errors." (Emphasis supplied.)

The legislative history of House Bill 2666 shows that the legislature intended that the writ of continuing garnishment was to attach wages paid in the typical employer-employee relationship. The testimony of Kenneth Rider, attorney for the Oregon Collector's Association that sponsored the bill, was unequivocal, that

"[t]he purpose of this bill is to reach non-exempt wages that are due to the debtor as of the date that the garnishee receives the writ of garnishment and these non-exempt wages that are going to become due in the next ensuing 60 days after the writ of garnishment has — during the life of the writ of garnishment which is 60 days from the date of issuance." Tape recording, Senate Judiciary Committee, June 27, 1989, Side B at 780.

The dissent finds persuasive testimony regarding the "classic example" of the promissory note. 133 Or App at 750. However, that example was given as an explanation of assets reached by a standard writ. That writ garnishes debts owed at the time of garnishment but not yet payable, the "classic example" being a promissory note. The testimony was that the continuing writ was "fashioned after the current phrasing of the [standard] writ of garnishment" and contains an analogous section that

"what we are doing is we are attaching continuing payments that are going to be made in the form of wages * * *." Tape recording, Senate Judiciary Committee, June 27, 1989, Side B at 583.

There is nothing in the legislative history of the 1991 amendment to ORS 29.401 that supports the conclusion that, by lengthening the time of the writ, the legislature intended the garnishment to reach assets other than wages. The amendment was part of House Bill 2992, which dealt with the amount of wages exempt from garnishment. Testimony was presented regarding the relationship of the proposed exemptions to federal law, the basis that would be used to calculate the exemptions and the effect of wage garnishment on low income families. *See* Minutes, House Labor Committee, April 17, 1991.

The original version of House Bill 2992 did not contain an amendment to ORS 29.401. The amendment was offered at the suggestion of the Collector's Association.

Representative Maddox explained the purpose of the amendment:

> "Actually, it gives [the creditor] a longer time to use the garnishment which would save the garnishment fee for the person who has to pay it—that's usually the person who's garnished. *Makes it more convenient for people running the payroll system.*" Tape recording, House Labor Committee, May 15, 1991, Side A at 190 (emphasis supplied).

The legislative history does not support the conclusion that the legislature ever intended the writ of continuing garnishment to reach the monies at issue here—monies due on a contract between businesses. That conclusion is also supported by the statutes.

■ A basic tenet of statutory construction is that words of common usage are to be given their natural, plain and obvious meaning. *Perez v. State Farm Mutual Ins. Co.*, 289 Or 295, 299, 613 P2d 32 (1980). Under ORS 29.415, the writ of continuing garnishment "shall be in substantially the [statutory] form" and the garnishee shall be informed that the writ

> "*garnishes only wages* [the garnishee] owe[s] to the Debtor as of the date you received this writ, including the debts that existed but were not yet due when you received this writ and *wages* that accrue on or before 90 days after the date this writ is issued." (Emphasis supplied.)

The garnishee is also instructed that

> "YOU MUST ANSWER THIS WRIT BY COMPLETING AND FILING A CERTIFICATE OF GARNISHEE *WHETHER OR NOT YOU OWE ANY WAGES* TO THE DEBTOR.
>
> "IF YOU FAIL TO ANSWER THIS WRIT, OR IF YOU ANSWER IT UNTRUTHFULLY, OR *IF YOU FAIL TO DELIVER THE WAGES* WHEN REQUIRED TO DO SO, YOU MAY BE SUBJECT TO COURT PROCEEDINGS UNDER ORS 29.285 AND MAY BE HELD LIABLE TO THE CREDITOR * * *:
>
> "* * * * *
>
> "NOTE: YOU MAY NOT LAWFULLY DISCHARGE THE DEBTOR FROM EMPLOYMENT AS A RESULT OF THIS GARNISHMENT." (Emphasis supplied.)

The "EARNINGS EXEMPTION COMPUTATION SCHEDULE" in ORS 29.415 uses both "wages" and the broader term "earnings" for calculating "Earnings subject to garnishment." ORS 29.401 also authorizes garnishment of "earnings." However, both "earnings" and "wages" are generally understood to apply to compensation for labor,[6] not contract amounts owed from one business to another for the painting and refurbishing of a barge.

Miller relies only on ORS 23.175(3)[7] to support its argument that Zidell may be a garnishee here. However, the reference is to all of ORS 23.175, and subsection (3) must be considered in context. ORS 23.175 is the definition section for ORS 23.175 and ORS 23.185.[8] Under ORS 23.175(3), the "employer" is the one who "engages a person to perform work or services for which *compensation* is given * * *." (Emphasis supplied.) Under ORS 23.175(2), "earnings" are defined as

> "*compensation paid or payable for personal services,* whether denominated as wages, salary, commission, bonus or otherwise, and includes periodic payments pursuant to a pension or retirement fund." (Emphasis supplied.)

When ORS 23.175(3) is considered in the context of ORS 23.175, ORS 29.401 and ORS 29.415, it shows the legislative intent that the writ of continuing garnishment was to apply to compensation paid for personal services, even though those personal services might be paid to an independent contractor instead of to an employee.

---

[6] *Webster's Third New Int'l Dictionary* 714 (unabridged ed 1971) defines earnings as "something (as wages or dividends) earned as compensation for labor or the use of capital;" and, at 2568, the dictionary defines wages as "a pledge or payment of usu. monetary remuneration by an employer esp. for labor or services * * *." The dictionary provides the synonyms of wages, at 2569, stating that the term wages "applies chiefly to an amount paid daily or weekly esp. for chiefly physical labor * * * SALARY and STIPEND usu. apply to a fixed compensation commonly paid at longer intervals than wages & usu. for services that require training or special ability * * *." Under those definitions, "earnings" is a more inclusive term than "wages," but both apply to compensation for services.

[7] ORS 23.175(3) was enacted in 1985 as part of a large support enforcement bill that was intended to provide an expeditious procedure for wage garnishment. Or Laws 1985, ch 671, § 2; Minutes, Senate Judiciary Committee, May 28, 1985.

[8] ORS 23.185 provides the maximum wage that can be garnished. It is the basis for the calculations to be made in the continuing writ form and uses "wages" and "earnings" interchangeably, as does ORS 29.415.

The contract between Zidell and West does not provide for compensation for personal services. The contract states:

"This purchase order covers all labor & material required to paint-out complete, in a turnkey manner, all specified interior and exterior surfaces of ZMC barge No. 647. All in strict accordance with buyer's request for quotation dated March 8, 1993; applicable material manufacturer's/suppliers application recommendations, seller's proposal dated March 25, 1993 & subsequent pre-contract award meetings."

Under the contract, West was obligated to purchase worker's compensation insurance, any federal insurance required under federal law, and employers' liability, public liability and property damage insurance.

In other words, Zidell owes money on a contract that is not just for labor; it is, in part, for materials, liability insurance and other costs of business. The money owed is not "earnings" or "wages" under ORS 29.401 or ORS 29.415, and Zidell is not the employer of West or Gayas for purposes of the continuing garnishment. Because Miller improperly served Zidell with writs of continuing garnishment, Miller never became a lien creditor for either West or the Gayas. It had no claim to the money owed by Zidell, irrespective of whether Capital had a perfected security interest.

Affirmed.

**LANDAU, J.,** concurring.

I agree with the majority's conclusion that the writ of continuing garnishment that Miller served on Zidell was not effective. I do not agree with the majority's reasoning in two respects.

My first disagreement is with the majority's conclusion that certain language in ORS 29.401 may be ignored as a mere "clerical error." The majority reaches that conclusion in response to the dissent's argument that the disputed language supports its reading of the statute. ORS 29.401 provides, in relevant part:

"In addition to garnishment proceedings otherwise available under ORS * * * 29.401 to 29.415, a person for whom a writ of garnishment may be issued under ORS 29.137 may

obtain a writ of continuing garnishment against any garnishee who is an employer of the defendant. To the extent that the earnings [owed by the defendant] are not exempt from garnishment, the garnishment shall be a lien and continuing levy against earnings owed by the garnishee to the defendant at the time of service * * *."

The catch is that the "garnishment proceedings otherwise available under ORS * * * 29.401 to 29.415" are proceedings for obtaining a writ of continuing garnishment. Thus, the statute contains a meaningless reference to itself: In addition to the proceedings for obtaining a writ of continuing garnishment, a person may obtain a writ of continuing garnishment.

According to the dissent, the provision that one may obtain a continuing writ of garnishment "in addition to" garnishment proceedings "otherwise available" under ORS 29.401 to ORS 29.415, which is the writ of continuing garnishment statute,

"indicates that a continuing writ, described in ORS 29.401 to ORS 29.415, may be used to garnish more than just earnings owed by an employer to an employee."

133 Or App at 744. In other words, because the statute authorizes the issuance of a writ of continuing garnishment to garnish "earnings," and then, "in addition to" that, goes on to authorize the issuance of a writ of continuing garnishment, the dissent concludes that the writ of continuing garnishment procedure must allow garnishment of something more than the garnishment of earnings. In my view, that is a reading of the statute only Lewis Carroll would love. To maintain it, the dissent is required to assert that the same statutory language means two different things at the same time.

The majority concedes that the statutory cross-reference to itself "could well effect a substantive change in the continuing writ provisions," as the dissent argues. 133 Or App at 750. The majority avoids that effect, however, by deeming the cross-reference a "clerical error." *Id.* I would neither grant the dissent that concession nor attempt to avoid it by means of clerical error.

We may ignore clerical errors that have been introduced into legislation by legislative counsel and not actually

enacted by the legislature. *See, e.g., State v. Lermeny*, 213 Or 574, 580, 326 P2d 768 (1958); *Mitchell v. Board of Education*, 64 Or App 565, 568, 669 P2d 356, *rev den* 296 Or 120 (1983). That is not, however, what we confront in this case, in which the so-called "clerical error" was voted on and enacted by the legislature.

I am aware that, in one case, Justice Linde suggested that we may ignore the misnumbering of a section, and insert additional statutory section references, if that comports with our understanding of the legislature's intentions, based on the legislative history of the enactment. *Bush v. Greyhound Lines, Inc.*, 295 Or 619, 622, 669 P2d 324 (1983). Still, I have a difficult time squaring that decision with our statutory duty:

> "[T]o ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted * * *."

ORS 174.010. Indeed, the notion that we are free — on the basis of our reading of the tea leaves of legislative history — to rewrite the language of statutes that the legislature has enacted raises in my mind serious questions concerning the separation of powers between the legislative and judicial branches.

Rather than rely on the device of clerical error, I would confront the statutory problem head on: The language that the legislature enacted is a redundancy. I am well aware of the countless cases that recite the hoary maxim that we are loath to conclude that the legislature enacted language that has no meaning. The fact remains that sometimes the legislature does that. We are permitted to deem language meaningless if "no other reasonable conclusion is available." *1000 Friends of Oregon v. Wasco County Court*, 299 Or 344, 358, 703 P2d 207 (1985). This is such a case. The disputed language in ORS 29.401 should be ignored because it is capable of no reasonable construction, not because it is a clerical mistake.

My second disagreement with the majority concerns its determination that the writ Miller served on Zidell is ineffective. In my view, the matter may be resolved in a straightforward fashion: The writ of continuing garnishment

applies only to "earnings," which the statute clearly treats as synonymous with "wages." This case does not involve the garnishment of "wages." Therefore, the writ was ineffective.

That the matter may be resolved in that manner is borne out by the language of the statute. Although the writ of continuing garnishment statutes do not define "earnings," they do provide a form that "shall be" followed when serving the writ upon a garnishee employer. ORS 29.415 states, in part,

> "This section establishes a form for a writ of continuing garnishment described in ORS 29.401 to 29.415 and issued by an attorney as described in ORS 29.137 and 29.139. A writ of continuing garnishment issued by an attorney shall be in substantially the following form:"

The statute then describes the obligations of the garnishee as follows:

> "YOU MUST ANSWER THIS WRIT BY COMPLETING AND FILING A CERTIFICATE OF GARNISHEE WHETHER OR NOT YOU OWE ANY *WAGES* TO THE DEBTOR.

> "IF YOU FAIL * * * TO DELIVER THE *WAGES* WHEN REQUIRED TO DO SO, YOU MAY BE SUBJECT TO COURT PROCEEDINGS * * *."

ORS 29.415. (Emphasis supplied.) The statute also requires that a garnishee be advised that,

> "*This writ garnishes only wages* you owe to the Debtor as of the date you received this writ, including debts that existed but were not yet due when you received this writ and *wages* that accrue on or before 90 days after the date this writ is issued.

> "* * * * *

> "*[I]f you cannot tell from the writ whether you owe any wages to the Debtor, the writ does not garnish anything * * *.*"

ORS 29.415. (Emphasis supplied.) Finally, the garnishee must certify that at the time of the delivery of the writ, the garnishee,

> "had in my possession, control or custody *only the following wages* due or to become due * * *."

ORS 29.415. (Emphasis supplied.) Presumably, the legislature would not direct attorneys and clerks of the court to advise garnishees that the "writ garnishes only wages," if it actually intended that a writ of continuing garnishment reach something other than "wages." The only reasonable conclusion that can be drawn from the legislature's own description of the effect of ORS 29.401 is that a writ of continuing garnishment may only be used as a levy against "wages."

The term "wages" generally connotes some sort of payment on a regular basis, pursuant to an established rate per specified period of time. *Webster's*, for example, defines the term as follows:

> "a pledge or payment of usu. monetary renumeration by an employer esp. for labor or services usu. according to contract *and on an hourly, daily, or piecework basis* * * * [and] applies chiefly to an amount *paid daily or weekly* * * *."

*Webster's Third New Int'l Dictionary* 2568 (unabridged ed 1993). (Emphasis supplied.)

Wages are not involved in this case. Zidell does not owe West payment on an hourly, daily, weekly or piecework basis. To the contrary, Zidell was obligated to pay West pursuant to a purchase order, under which West was to provide hired workers, supply materials and equipment and acquire insurance coverage, all for the painting of Zidell's barge. When the work on the barge was completed, Zidell was to pay West a predetermined sum of money in order to cover the costs of West's labor and materials. West was not paid according to the length of time required to complete the project. Rather, West was paid according to the cost of the project, plus some amount representing profit. Zidell did not owe West "wages." Consequently, Miller's writ of continuing garnishment did not operate as a levy against the money Zidell owed West under the terms of the purchase order. In my view, that ends the matter.

The majority goes on to discuss several additional issues, I think unnecessarily. The majority, for example, relies on ORS 23.175(3) to support its position that the reference to "earnings" in ORS 29.401 does not cover the money Zidell owed West in this case. 133 Or App at 736-37.

The definition of "earnings" in ORS 23.175(3), however, applies only to the term "[a]s used in this section [ORS 23.175] and ORS 23.185." ORS 23.175. Whatever "earnings" may mean for the purposes of those statutes, the fact remains that, for the purposes of ORS 29.401, the legislature has manifested its intention to use the term in the narrow sense of "wages" only.

The majority also takes on the dissent's reading on legislative history in disputing the legislature's intended definition of the term "wages." I think that is unnecessary as well. Whatever the legislative history might show cannot alter the fact that the legislature unambiguously referred to the term "earnings" in ORS 29.401 to mean "wages" only. I do not advocate mindless adherence to the artificial constraints imposed upon us by *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611-12, 859 P2d 1143 (1993). Nevertheless, when the language at issue is not capable of the construction that is being asserted, no amount of legislative history is sufficient to alter that fact. In my view, the dissent's proposed construction does unreasonable violence to the statutory language, and, to me, that should be the long and the short of the discussion.

Finally, the majority contests the dissent's argument that the writ of continuing garnishment is not limited to the service of "employers" in the "typical employer-employee" relationship and may also apply to cases in which an independent contractor has been retained. At least for the purposes of this case, it is not necessary to resolve that issue. If the contract between Zidell and West does not provide for the payment of "wages," the writ of continuing garnishment is ineffective regardless of how the contractual relationship is characterized or the statutory term "employer" is defined.

Edmonds and Armstrong, JJ., join in this concurring opinion.

**LEESON, J.,** dissenting.

I disagree with the majority's conclusion that Miller is not a judgment lien creditor, and, therefore, I would reach the issues of whether Capital nevertheless has priority as the owner of the accounts receivable or as holder of a perfected security interest. Because I think that there are genuine

issues of material fact yet to be resolved in this case, I would reverse and remand.

The majority reasons that the use of the writ of continuing garnishment is restricted to assets that are "earnings" and to garnishees who are "employers," and because those terms are not defined, their plain meanings preclude the use of that writ by Miller to reach contract payments owed by Zidell to an independent contractor such as West or the Gayas. In doing so, the majority appears to conflate the terms "earnings" and "wages."[1] It also sets the stage for confusion in future applications of the statute by indicating that the term "employer" might apply to a relationship with an "independent contractor instead of an employee," but not if the relationship involves "contract amounts owed from one business to another." 133 Or App at 736.

I am persuaded that the writ of continuing garnishment may be used to garnish more than merely wages owed by an employer. I reach that conclusion by following the now familiar analytical structure outlined in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 859 P2d 1143 (1993), which the majority apparently has concluded is unnecessary. To discern the intent of the legislature, we must first examine the statute's text and context; only in the face of ambiguity is it necessary to supplement that analysis by consideration of the legislative history. *Id.* at 610-12. Although words are typically given their plain meaning, where there are multiple provisions the meaning adopted should, if possible, give effect to all. *Id.* at 611.

ORS 29.401 provides:

"*In addition to garnishment proceedings otherwise available under* ORS 29.125 to 29.375 and *29.401 to 29.415*, a person for whom a writ of garnishment may be issued under ORS 29.137 may obtain a writ of continuing garnishment against any garnishee who is an *employer* of the defendant. To the extent that the *earnings* are not exempt from garnishment, the garnishment shall be a lien and continuing levy against *earnings* owed by the garnishee to the defendant at the time of service of the writ of continuing garnishment and on all *earnings* accruing from the garnishee to the defendant

---

[1] The concurrence baldly asserts that the statute "clearly treats ['earnings'] as synonymous with 'wages.' " 133 Or App at 740.

from the date of service until 90 days have expired since the date of issuance of the writ or until the employment relationship is terminated, the underlying judgment is vacated, modified or satisfied in full or the writ is dismissed, whichever is sooner." (Emphasis supplied.)

That statute authorizes the use of a writ of continuing garnishment against "earnings" owed by an "employer" as an "addition to garnishment proceedings otherwise available under * * * 29.401 to 29.415." The "otherwise available" language indicates that a continuing writ, described in ORS 29.401 to ORS 29.415, may be used to garnish more than just earnings owed by an employer to an employee.

Rather than interpreting the statute, the majority attempts to refute my emphasis on the phrase that introduces ORS 29.401, conceding that the "reference to 'ORS 29.401 to 29.415' could well effect a substantive change in the continuing writ provisions." 133 Or App at 733. The majority is correct that the language "and 29.401 to 29.415," which was not included in Oregon Laws 1989, chapter 876, section 2, was first inserted into ORS 29.401 in the 1989 codified version. What it ignores, however, is the fact that in 1991, when the legislature amended ORS 29.401, it retained that language in the reenacted law. Or Laws 1991, ch 845, § 9. There is a presumption that historical facts involving the subject matter of legislation "were known to the legislature at the time of the adoption of the act." *Anthony et al. v. Veatch et al.*, 189 Or 462, 497, 220 P2d 493, 221 P2d 575 (1950); *see also State v. Linn*, 131 Or App 487, 885 P2d 721 (1994), *rev den* 320 Or 508 (1995) (same proposition used to uphold voter initiative despite absence of indication that phrase from former statute was omitted). The language that is so pivotal to the majority's construction of the statute was indisputably adopted by the legislature in 1991. We are not at liberty to omit what has been inserted. ORS 174.010; *PGE*, 317 Or at 611. All the words in ORS 29.401 must be considered in its statutory construction.

The concurrence also disagrees with the majority's analysis, but nevertheless feels free to disregard the disputed language as a redundancy "capable of no reasonable construction." 133 Or App at 739. Its analysis adds little but a Cheshire Cat grin. Indeed, its distaste for "the tea leaves of

legislative history" forces it to move statutory construction into the realm of statutory engineering. The concurrence attempts to preserve the statutory language by removing its internal frame and preventing its collapse by buttressing it with forms.

Nonetheless, the form of the writ, described in ORS 29.415, identifies the information that the creditor must provide to the garnishee. It requires the debtor to be identified either by the *"Debtor's* Social Security Number or *Employer Identification Number."* (Emphasis supplied.) An Employer Identification Number (EIN) is issued by the Internal Revenue Service to those who employ others. An individual employee would not have an EIN. It follows that the writ of continuing garnishment is not restricted merely to earnings owed to an individual employee.

Language in the Earnings Exemption Computation Schedule, provided in ORS 29.415, bolsters this conclusion. That schedule must be completed by a garnishee who is an "employer" to calculate the amount subject to garnishment, by designating certain earnings as exempt and subtracting those from the debtor's gross weekly earnings. It imports from ORS 23.175 a broad definition of "employer" that includes any entity that "engages a *person* to perform work or services * * * even though the relationship of the *person* so engaged may be as an *independent contractor* for other purposes." (Emphasis supplied.) An "exemption" is something that is "excepted from the operation of some law." *Webster's Third New Int'l Dictionary* 795 (unabridged ed 1976). It follows that, if some earnings received by an independent contractor are part of the exception from the operation of the law in ORS 29.401, then earnings received by an independent contractor must be included in the reach of ORS 29.401. To construe the broad definition of "employer" as applicable only to earnings exemptions and not to what is included in the writ itself, would allow as an exemption something that is not part of the whole. That would render the reference to ORS 23.175 meaningless, a result I do not think the legislature intended. Moreover, as used in ORS 29.401 through ORS 29.415, "person" includes "individuals, partnerships and corporations." ORS 29.125(4). The majority overlooks that definition when it concludes that the "legislature [never]

intended the writ of continuing garnishment to reach monies at issue here—monies due on a contract between businesses." 133 Or App at 735. Whether an independent contractor is an individual, partnership or corporation is of no consequence. Read together, ORS 29.401 through ORS 29.415, ORS 29.125(4) and ORS 23.175(3) indicate that the legislature intended the writ of continuing garnishment to reach sums owed by a garnishee such as Zidell to an independent contractor such as West or the Gayas.

Although I think that the text and context of the statute point to a conclusion opposite to the majority's, I also think that the continuing garnishment statute is ambiguous.[2] ORS 29.415 describes the garnishee's duties. Step 1 of those instructions informs the garnishee that "[t]his writ garnishes *only wages* you owe the debtor * * * and *wages* that accrue on or before 90 days after the date this writ is issued." (Emphasis supplied.) Although the majority suggests that the quoted phrase renders the statute explicit, when read in context it is clearly susceptible to more than one interpretation. That provision may also be read as describing only the subset of wages that can be garnished by the writ, *i.e.*, those wages owed and those that accrue within 90 days, rather than limiting the continuing writ to wages only. The garnishee's duties refer to "wages" at least 18 times. The "Certificate of Garnishee" must be completed even if the garnishee does not pay wages. The Earnings Exemption Computation Schedule is to be completed "only if you pay wages," but refers to both "earnings" and "wages." Although on that schedule "employer" is defined broadly by reference to ORS 23.175, ORS chapter 29 does not define "earnings" or "wages." The Earnings Exemption Computation Schedule places the terms "earnings" and "disposable earnings" in quotation marks and omits quotation marks from the term "wages." "Earnings" and "disposable earnings" are defined in ORS 23.175. Even if I were to assume that those two terms are used according to the definitions in ORS 23.175, the definition of "earnings" there includes all forms of compensation, "whether denominated as wages, salary, commission, bonus

---

[2] Apparently the majority concludes that the statute is clear, once the language "and 29.401 to 29.415" is excised. As I have explained, I do not believe that that language can be excised. The concurrence has also decided to disregard that phrase. I believe that its presence in the statute contributes to the statute's ambiguity.

or *otherwise*." (Emphasis supplied.) That the continuing garnishment statute repeatedly uses the term "wages" to inform garnishees of their responsibilities, rather than other terms that could have been used to more broadly describe the type of funds subject to garnishment, renders it sufficiently ambiguous to require examination of its legislative history.[3]

The majority purports to give plain meaning to the statutory terms to reach a different conclusion. It relies on dictionary definitions to conclude that "both 'earnings' and 'wages' are generally understood to apply to compensation for labor." 133 Or App at 736. I think "earnings" is a much broader concept. To "earn" means "to receive as equitable return for work done or services rendered" or "to have accredited to one a remuneration." *Webster's Third Int'l Dictionary* 714 (unabridged ed 1976). To "remunerate" means to "pay an equivalent for" or to "compensate." *Id.* at 1921. "Earnings" must also encompass payments that accrue under a contract for services, particularly, as in this case, where the contract envisions payment associated with completion of subparts of the total contracted service.[4] The concurrence, in reliance on its interpretation of the dictionary definition of "wages," also overlooks that the agreement calls for incremental payments by Zidell on a piecework basis.

The majority also seeks to exclude contract payments owed by Zidell because the contract "covers all labor & material required" and because West was required to provide various forms of insurance coverage. Nevertheless, the majority acknowledges that the writ might apply even though

---

[3] The concurrence views the legislature's use of the term "wages" in the forms as its method of defining "earnings." Presumably the legislature would not have defined the writ in ORS 29.401 as against "earnings" had it intended the writ to reach only "wages."

[4] The contract between Zidell and West specifies as terms of payment for interior work:

| | | |
|---|---|---|
| "25% | ($10,867.00) | upon completion of two ballast tanks |
| 25% | ($10,867.00) | upon completion of four ballast tanks |
| 40% | ($17,386.00) | upon completion of all ballast tanks |
| 10% | ($ 4,346.00) | 2% - 10, net 30 days." |

The change order to that contract specifies terms of payment for exterior work:

| | | |
|---|---|---|
| "30% | ($22,354.00) | on completion of Hull cleaning & priming |
| 25% | ($18,628.00) | on completion of Hull |
| 35% | ($26,079.90) | on completion balance of scope of work |
| 10% | ($ 7,451.60) | 2% - 10, net 30 days." |

compensation for "personal services might be paid to an independent contractor instead of to an employee."[5] 133 Or App at 736. It concludes that, because the money owed is "not just for labor," but is "in part, for materials, liability insurance and other costs of business," the money is not "earnings." 133 Or App at 737. These propositions are incongruous. The first includes independent contractors; the second manipulates the definition of "personal services" to exclude the very same group. From a business perspective, the advantage of hiring an independent contractor is to avoid certain responsibilities inherent in an employer-employee relationship, including ongoing supervision and control, purchasing of needed materials, and acquiring various forms of insurance. It is well understood that the remuneration negotiated into a contract factors in the independent contractor's costs of doing business. Moreover, even in a typical employer-employee relationship, remuneration often includes reimbursement of employee business expenses, including certain types of insurance and the purchasing of materials. The majority construes the statute to define a writ so riddled with exclusions as to limit it exclusively to the straight wage paying employer, and even then perhaps not if the debtor-employee is due reimbursement for expenses. The legislative history reveals that such a crabbed construction was not intended.[6]

House Bill 2666, which amended ORS chapter 29 to permit writs of continuing garnishment, was sponsored by the Oregon Collectors Association (OCA) and introduced in the 1989 legislative session. Or Laws 1989, ch 876, §§ 4, 5, 9. The Staff Measure Summary from the House Committee on the Judiciary described the measure as creating

---

[5] The majority suggests that the continuing writ might apply to individual contractors but not to entities such as West. If that is the case, and I do not think that it is, then the majority should also address whether West Painting, Inc., was in fact dissolved and whether Gaya, as an individual, is the debtor.

[6] The concurrence construes the writ as narrowly as the majority, purportedly reaching its conclusion solely by its interpretation of the term "earnings" and without the need, it proclaims, to discuss the meaning of "employer." It is disingenuous to pretend that such a restricted view of "wages" does not implicate the meaning of "employer," particularly when the definition of "employer" imported from ORS 23.175(3) envisions a relationship that encompasses a nearly unrestricted view of compensation. In any event, the interplay of the majority and concurrence further underscores the ambiguity of the statute. That such ingenuity is required to save the statute from its own ambiguity suggests that it is the concurrence that is doing "unreasonable violence to the statutory language." 133 Or App at 742.

"a continuing writ of garnishment for the garnishing of wages. The garnishment would last for sixty days from the date of issuance of the writ or until the employment relationship is terminated."

The summary's reference to "wages" and "employment relationship" could be read to suggest that the writ of continuing garnishment was not intended to reach contractual debts owed to a contractor. However, testimony by OCA representative Jim Markee and OCA lawyer Kenneth Rider indicates otherwise.

Markee explained to both the House Subcommittee on Civil Law and Judicial Administration and the Senate Judiciary Committee that the continuing writ was against wages and not against bank accounts. On June 27, 1989, he testified before the Senate Committee that the writ "only applies to wage garnishments; we didn't feel it appropriate to try to create a continuing writ of garnishment against bank accounts and the like." That testimony, contrasting what Markee termed "employer-type garnishments" against funds held in bank accounts, suggests that he did not envision a narrow definition of employer for purposes of the writ of continuing garnishment. Rider's testimony during the June 27 Senate Judiciary Committee hearing reinforces that understanding.

Rider was questioned about language in the Certificate of Garnishee, which is filled out by the garnishee in response to service of the continuing writ. The form instructs the garnishee to place "a check in front of all the following statements that apply." Rider explained that one of the response categories was "envisioned to reach any nonexempt wages during the 60 days the writ is in effect." He stated that another response category was "fashioned after the current phrasing of the [standard] writ and reaches property currently owed at the time the writ is issued but not [yet] payable." To illustrate his understanding of the purpose of that response category, he stated that the "classic example is the promissory note which will become due." He also stated that the writ of continuing garnishment could reach the "one-time payment owed to a subcontractor which will become due." At the completion of Rider's testimony, the Senate Judiciary Committee made only minor changes to the

forms by correcting internal inconsistencies, and the bill passed in both houses of the legislature with little floor discussion.

The majority dismisses the "classic example" as showing that the continuing writ was "fashioned after" the standard writ; it attaches no importance to the overlap described by Rider. It also ends its inquiry without considering Rider's statement about "one-time payments owed to a subcontractor." I agree that the writ of continuing garnishment applies to nonexcludable wages in a typical employer-employee relationship, and I may even concede that to be its primary function. However, I do not think that the continuing writ was intended to be restricted exclusively to that use.

Analysis of the text and context of the statute, and examination of the testimony on HB 2666, lead me to reject Capital's contention that the writ of continuing garnishment was not intended to reach contractual debts owed to a contractor. I am persuaded that the legislature intended the writ of continuing garnishment to allow garnishment of money owed but not yet due from a garnishee to an independent contractor. Miller's writ of continuing garnishment made it a judgment lien creditor under ORS 79.3010.[7] Therefore, I would address the questions regarding priority among creditors under the Uniform Commercial Code.

Capital claims that it has a perfected security interest in all of West's present or after-acquired accounts, accounts receivable and contract rights.[8] Miller concedes that, if Capital

---

[7] I am also reluctant to conclude that the writ served by Miller would fail because it is labeled, "Writ of Continuing Garnishment" rather than, "Writ of Garnishment." The form used by Miller reads: "THIS IS A WRIT OF / CONTINUING / GARNISHMENT (Strike 'Continuing' if one time writ only)." It further provides space for the creditor to:

"Check Appropriate Box:

"☐ Writ of Garnishment
"☐ Writ of Continuing Garnishment[.]"

[8] The security agreement identifies numerous types of collateral:

"ALL OF THE ACCOUNTS, ACCOUNTS RECEIVABLE, INSTRUMENTS, DOCUMENTS, CONTRACT RIGHTS, CHATTEL PAPER, INVENTORY, EQUIPMENT, MONEY DEPOSIT ACCOUNTS, INSURANCE POLICIES, RESERVES, RESERVE ACCOUNTS, GENERAL INTANGIBLES AND PROCEEDS THEREOF, PRESENTLY EXISTING OR HEREAFTER ACQUIRED

has a perfected security interest, then Capital has priority, even though Miller is a judgment lien creditor. ORS 79.3010(1)(b). Miller contends, however, that Capital's security interest is not properly perfected, because the financing statement that Capital recorded listed "West Painting, Inc." as the debtor. It argues that "West Painting, Inc.," a Washington corporation, had ceased to exist, because it was administratively dissolved in June 1986, for failing to file an annual report or to pay the annual license fee required by statute. *Former* RCW § 23A.28.125 (*repealed by* Wash Laws 1989, ch 165, § 204, *renumbered* RCW § 23B.14.200). Thus, Miller claims, the true debtors were the Gayas, acting as individuals under an assumed trade name, and the Oregon financing statement, naming "West Painting, Inc." as debtor, was seriously misleading and ineffective to perfect a security interest. ORS 79.4020(7), (8). The trial court concluded that, under Oregon law, Capital's security interest was not misleading and held that Capital has priority, because its security interest was properly perfected.

The parties agree that Capital's interest is in accounts. However, Capital and West argue that the "factoring"[9] arrangement between them constitutes a sale of accounts, that Capital's filing of a financing statement was merely "an exercise in caution" and that compliance with the filing requirements was unnecessary to protect that interest. That argument fails to recognize that the Uniform Commercial Code-Secured Transactions (UCC), ORS 79.1010 *et seq*, applies to the sale of accounts, as well as to an express granting of a security interest. ORS 79.1020(1)(b). Therefore, in order to attain priority over a judgment lien creditor, Capital's interest must be perfected.

Oregon's version of the UCC adopts the uniform provisions of UCC section 9-103, regarding choice of law principles, where commercial contacts span state boundaries

---

BY DEBTOR. ALL GOODS AND INVENTORY RELATING HERETO IN ALL STAGES OF MANUFACTURE, PROCESS OR PRODUCTION. ALL OTHER PROPERTY, INCLUDING BUT NOT LIMITED TO THAT NOW AND HEREAFTER OWNED BY DEBTOR IN WHICH DEBTOR NOW OR HEREAFTER HAS ANY RIGHT WHEREVER SITUATED AND WHENEVER ACQUIRED. ALL BOOKS AND RECORDS PERTAINING TO ACCOUNTS AND ALL THE PROCEEDS OF THE FOREGOING PROPERTY."

[9] "Factoring" is a commonly used short-term financing arrangement whereby the debtor assigns acceptable accounts receivable to the creditor at a discount.

and priority disputes depend on the perfection of a security interest.[10] Where the collateral at issue is accounts,

"[t]he law (including the conflict of law rules) of the *jurisdiction in which the debtor is located* governs the perfection and the effect of perfection or nonperfection of the security interest." ORS 79.1030(3)(b). (Emphasis supplied.)

There is no dispute that the debtor — whether ultimately determined to be West or the Gayas — is located in Washington. ORS 79.1030(3)(d). Therefore, whether Capital has a perfected security interest depends on whether it properly filed a financing statement in Washington, not on whether it properly filed a financing statement in Oregon.

The trial court considered only the financing statement that Capital filed in Oregon. The trial court record refers to a financing statement that had been filed in Washington, but neither that filing statement nor its contents is part of the record. Thus, a material issue of fact exists about whether Capital has a perfected security interest that precludes the granting of summary judgment. *Bostick Family Trust v. Magliocco*, 64 Or App 305, 308, 667 P2d 1044 (1983).

Whether Capital's security interest has attached necessarily precedes the determination of perfection.[11] Despite Miller's arguments that West lacked contractual capacity to grant a security interest, the trial court appears to have assumed without deciding that Capital has a security interest and that that interest has attached under UCC section 9-203.[12] Whether that assumption is correct also

---

[10] Choice of law rules regarding multiple state transactions in ORS 79.1030 are identical to model UCC section 9-103. RCW 62A.9-103 is also identical to the UCC. Under those rules, when conflicting claims depend on perfection of a security interest, the proper jurisdiction varies with the type of collateral. Thus, it is often the case that a financing statement must be filed in more than one jurisdiction in order to perfect all the types of collateral listed in the security agreement.

[11] ORS 79.3030, which is identical to UCC § 9-303 in this respect, provides, in part:

"(1) A security interest is perfected when it has attached and when all the applicable steps required for perfection have been taken."

[12] ORS 79.2030, which is identical to UCC § 9-203 in this respect, provides, in part:

"(1) * * * [A] security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless:

"(a) The collateral is in the possession of the secured party pursuant to

presents unresolved questions of fact. In their Memorandum in Support of the Motion for Summary Judgment, West and Capital contended that the State of Washington failed to follow the correct procedure for administratively dissolving West. To administratively dissolve a corporation, Washington law requires that the secretary of state provide the corporation with written notice of its delinquency, a 60-day period to correct, and a copy of the certificate of dissolution. *Former* RCW § 23A.28.125 (*repealed by* Wash Laws 1989, ch 165, § 204, *renumbered* RCW § 23B.14.210). Affidavits submitted to the trial court attest that, "at all relevant times, [West's directors] were unaware that the corporate status of West Painting, Inc. had lapsed." The obvious inference, that the State of Washington failed to provide the notice required by statute, raises a factual question that could be dispositive on the issue of whether Capital's security interest attached. Even if West had ceased to exist as a corporate entity, the question remains whether an enforceable security agreement was created by the Gayas, contracting in their individual capacities. *See Kreiger v. Hartig*, 11 Wash App 898, 903, 527 P2d 483, 486 (1974). The existence of these material issues of fact precludes summary judgment in this case.

In sum, I would reverse and remand. I disagree with the majority's analysis of ORS 29.401 to ORS 29.415, and its consequent failure to address the other issues raised by this appeal.

I dissent.

Haselton, J., joins in this dissent.

---

agreement, or the debtor has signed a security agreement which contains a description of the collateral * * *;

"(b) Value has been given; and

"(c) The debtor has rights in the collateral.

"(2) A security interest attaches when it becomes enforceable against the debtor with respect to the collateral. Attachment occurs as soon as all of the events specified in subsection (1) of this section have taken place unless explicit agreement postpones the time of attaching."